UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

FRANK  SCHUMACHER,                    )
                                      )
                   Plaintiff,         )
                                      )
        vs.                           )        4:13-cv-00164-SEB-DML
                                      )
CREDIT PROTECTION ASSOCIATION,        )
DOES 1-10 Inclusive,                  )
                                      )
                   Defendants.        )

**ORDER ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**

This matter is before us on the parties' cross motions for summary judgment.  On

November 7, 2011 Plaintiff Frank Schumacher moved for partial summary judgment as to

Count II of his Complaint (violation of the Telephone Consumer Protection Act

("TCPA")).  [Dkt. No. 31.]  In response to Mr. Schumacher's motion, Defendant Credit

Protection Association ("CPA") filed a partial Cross Motion for Summary Judgment as to

Counts I and II of Plaintiff's Complaint and sought an award of attorneys' fees and costs.

[Dkt. No. 36.]  For the following reasons we GRANT Plaintiff's Motion for Summary

Judgment as to Count II and GRANT IN PART AND DENY IN PART Defendant's

Motion for Summary Judgment.

**Background and Facts**

The parties' dispute relates to telephone calls made by CPA to Frank Schumacher

in an attempt to collect a debt.  The debt was not Mr. Schumacher's.  Mr. Schumacher

contends that these calls violated the TCPA and the Fair Debt Collection Practices Act ("FDCPA"), which CPA denies.  The facts are straightforward and largely undisputed.

**Parties**

CPA is a debt collector.  In late July 2013, CPA was assigned an account from Louisville Gas & Electric to collect a debt from Christopher Williams.  Louisville Gas & Electric provided the telephone number 502-263-3427 (the "3427 number") to CPA in connection with the debt.  The 3427 number is Mr. Schumacher's cellular telephone number for which he has been the subscriber since January 2013 and is solely responsible for payment of the account.  Mr. Schumacher does not know the debtor responsible for the Louisville Gas & Electric debt that CPA attempted to collect.

CPA uses a third-party company called Dial Connection to take inbound telephone calls and make outbound telephone calls.  Mr. Schumacher describes Dial Connection as a "predictive dialer."  [Dkt. No. 33 at 3.]  Mr. Schumacher contends that "CPA feeds phone numbers daily into the Dial Connection system and, in turn, the predictive dialer automatically dials the numbers in the sequence established by CPA."  [Dkt. No. 33 at 5.] According to CPA, Dial Connection does not have the capacity to store or produce telephone numbers to be called through the use of a random or sequential number generator.  [Dkt. No. 37 at 4 (citing CPA Dep. at 19).]  CPA explains that the Dial Connection system cannot function without CPA inputting phone numbers into the phone system on a daily basis and determining the order in which the calls will be made.  [*Id.*]

**Calls Made by CPA to Mr. Schumacher**

Mr. Schumacher never provided his cellular telephone number to CPA and never gave consent for CPA to contact him. Likewise, Mr. Schumacher had no relationship with Louisville Gas & Electric (the creditor for whom CPA was attempting to collect a debt), has never been a customer of Louisville Gas & Electric, never provided his cell phone number to Louisville Gas & Electric, and did not give Louisville Gas & Electric his consent to be contacted on his cellular telephone. CPA concedes that Mr. Schumacher did not consent to CPA placing calls to his cellular telephone and that Mr. Schumacher did not provide the 3427 number to CPA. CPA has never collected a debt from Mr. Schumacher and has no relationship with him beyond this ensuing litigation.

It is undisputed that beginning in August 2013 Mr. Schumacher began receiving telephone calls on the 3427 number, some of which featured a prerecorded message, as follows:

> Hello. This message is for C-h-r-i-s-t-p-h-r Williams. If this is not C-h-r-i-s-t-p-h-r Williams, please call us back at 888-701-1043 to have your phone number removed from this account and discontinue listening to this message. This is Credit Protection Association calling concerning an important business matter. Please call us back at 1-888-745-2315. Please refer to account reference number []. This is an attempt by a debt collector to collect a debt, and any information received will be used for such purposes.

[Dkt. No. 33 at 4 (citing CPA Dep.at 38-39, 55-56; Schumacher Aff. at ¶ 7).] Mr. Williams was not known to Mr. Schumacher and (clearly) Mr. Williams was not reachable at the 3427 number. There was no live person on the line with whom Mr. Schumacher could speak when he answered these telephone calls.

Mr. Schumacher called CPA twice on September 24, 2014 using the number CPA provided in its prerecorded messages (888-701-1043) (once at 7:01 p.m. and again at 7:02 p.m.) for the purpose of advising CPA that it had been calling on the wrong number. Mr. Schumacher received a quick hang up when he called CPA on these two occasions and as a result he never spoke to a live person. It is undisputed that Mr. Schumacher did not speak to anyone at CPA at any time.[1]

Mr. Schumacher contends in his briefing that CPA called his cell phone a total of 54 times. [Dkt. No. 33 at 3 (citing CPA Dep. at 18-19, 22, 39, 40 and exhibits thereto).] CPA disputes that it called Mr. Schumacher 54 times based on his testimony that he was called 20-30 times. [Dkt. No. 37 at 3-4 (citing Schumacher Dep. at 12-13); *see also* Dkt. No. 31-6 (Schumacher Aff.) at ¶ 11 ("I received a total of 29 calls from CPA to my cellular

---

[1] CPA complains that Mr. Schumacher's recitation of his attempts to communicate with CPA are misleading and false. Mr. Schumacher alleged in his Complaint that he "repeatedly instructed" CPA to cease calling him and that "during each live conversation with Plaintiff, CPA informed Plaintiff that the call was an attempt to collect the Debt and request to speak to the Debtor" but that "Plaintiff informed CPA it was calling his personal cellular telephone and that the Debtor was unknown to him and unreachable at his telephone number" and "instructed CPA to remove his telephone number from the account and cease all communications with him" but that "CPA continued calling Plaintiff." [Dkt. No. 49 at 2 (citing Compl. at ¶¶ 18-22).] In response to interrogatories, Mr. Schumacher verified under oath that he "called CPA back several times." [*Id.* (citing Dkt. No. 39-5 at 5).] By the time Mr. Schumacher was deposed, he recalled calling CPA "one evening, twice in a row." [*Id.* at 2-3 (citing Dkt. No. 39-4 at 15).] Mr. Schumacher's recollection of calling CPA twice in immediate succession on one evening is confirmed by Mr. Schumacher's telephone records, revealing he made one call at 7:01 p.m. and another at 7:02 p.m. on September 24, 2014. Although a district court has the discretion to treat allegations in a party's pleading as judicial admissions which can sometimes trump the evidence, *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008 (7th Cir. 2000), Mr. Schumacher's allegations in his Complaint are contradicted by his subsequent statements under oath. Because Mr. Schumacher is not relying on his Complaint allegations in his request for summary judgment (and CPA is also not relying on Mr. Schumacher's Complaint in opposing or seeking summary judgment), we find that this inconsistency, although troublesome, does not affect the disposition of the parties' motions. [*See* Part B.3 *infra*.]

telephone without my consent.").]  Even so, CPA admits that its call log reflects a total of 54 calls placed to the 3427 number, although three of those calls were met with a busy signal and therefore did not result in a connected call.  [*Id.*]

None of the calls placed to the 3427 number made by Dial Connection were dialed manually.  [Dkt. No. 33 at 5 (CPA Dep. at 21, 22, 61).]  The 3427 number was entered into the Dial Connection database along with other numbers, and Dial Connection placed the telephone calls.  [*Id.* (citing CPA Dep. at 19).]  If a live person or voicemail/answering machine is detected by Dial Connection, it delivers the prerecorded message quoted above. [*Id.* (citing CPA Dep. at 25-26).]  The prerecorded messages delivered to the 3427 number were created by CPA.  [*Id.* (citing CPA Dep. at 58-59).]  All telephone calls made by Dial Connection are made on behalf of CPA and at CPA's direction.  [*Id.* (citing CPA Dep. at 58).]

As a result of CPA's calls to Mr. Schumacher, he asserts in this litigation claims arising under two federal statutes:  the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and the Federal Debt Collections Practice Act ("FDCPA"), 15 U.S.C. § 1692.

### Summary Judgment Standard

Summary judgment is appropriate when the record before the Court establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine

5

issues of material fact exist, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Id*. at 255. When, as in this case, the parties have filed cross-motions for summary judgment, "'we construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made.'" *Cavin v. Home Loan Center, Inc.*, 531 F.3d 526, 528-29 (7th Cir. 2008) (quoting *Premcor USA v. Am. Home Assurance Co.*, 400 F.3d 523, 526 (7th Cir. 2005)). However, neither the "mere existence of some alleged factual dispute between the parties," nor the existence of "some metaphysical doubt as to the material facts," will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000) (internal citations omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id*. at 325; *Doe v. R.R. Donnelley & Sons, Co.,* 42 F.3d 439, 443 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment

is not only appropriate, but mandated.  *Celotex,* 477 U.S. at 322*; Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003).

Courts are often confronted with cross-motions for summary judgment, as is the case here, because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "'In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard.'"  *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 902 (S.D. Ind. 2009) (quoting *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md.1998)). "When evaluating each side's motion the court simply 'construe[s] all inferences in favor of the party against whom the motion under consideration is made.'"  *Morgan v. Fennimore*, Cause No. 1:09-cv-399-SEB-TAB, 2010 WL 5057418, at *1 (S.D. Ind. Dec. 3, 2010) (quoting *Metro. Life Ins. Co. v. Johnson,* 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir.1998))).

## Analysis

The parties present the following legal questions for resolution on summary judgment.  First, does Mr. Schumacher have an injury-in-fact sufficient to satisfy Article III standing requirements to bring his TCPA claim against CPA?  Second, assuming that Mr. Schumacher has standing to bring his TCPA claim, does the Dial Connection system meet the definition of an ATDS?  Third, assuming that Dial Connection is an ATDS, how many calls did it make in violation of the TCPA?  Finally, did CPA's conduct in contacting Mr. Schumacher violate the FDCPA and, if not, was Mr. Schumacher's FDCPA claim made in bad faith?  We address each of these questions below.

## A.    TCPA.

The purpose of the TCPA is to protect the privacy interests of residential telephone subscribers and automated calls that invade privacy and pose nuisances.  *Abbas v. Selling Source*, LLC, 2009 WL 4884471, at *3 (N.D. Ill. Dec. 14, 2009).  The TCPA provides:

(b) Restrictions on use of automated telephone equipment

(1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States--

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--

. . .

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

47 U.S.C. § 227(b)(1)(A)(iii).  To establish a claim for a violation of the TCPA, Mr. Schumacher must prove that he was called on his cellular phone by an automatic telephone dialing system.  Although it is not disputed that CPA called Mr. Schumacher's cell phone, the parties disagree over whether Dial Connection is an "automatic telephone dialing system" or "ATDS."

### 1.    Mr. Schumacher's Standing To Bring a TCPA Claim.

CPA argues that Mr. Schumacher lacks standing because he did not sustain a personal injury or injury-in-fact from any alleged violation of the TCPA.  CPA's argument has been repeatedly rejected by the courts.  Indeed, one court recently dismissed outright such an argument as "frivolous."  *King v. Time Warner* Cable, No. 14 Civ. 2018(AKH),

8

2015 WL 4103689 (S.D.N.Y. July 7, 2015).  In any event, because questions of standing implicate the court's subject matter jurisdiction, we address this issue first.

To clear the Article III standing hurdle, plaintiffs must allege (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.  *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (citations and quotations omitted).  Such an injury may exist by virtue of a violation of statutorily-created legal rights, so long as the plaintiff is within the class of persons who are given a statutory right to relief and alleges a "distinct and palpable injury to himself."  *Warth v. Seldin,* 422 U.S. 490, 501 (1975); *see also Summers v. Earth Island Inst.,* 555 U.S. 488, 497 (2009) (although Congress can create procedural rights, Article III still requires the party bringing suit to show that the action "injures him in a concrete and personal way") (citation omitted).

CPA distinguishes Congress's authorization of a suit based on violation of a statutory right with an actual injury necessary to satisfy the case or controversy requirement of Article III.[2]  Although "[n]o statute can confer standing on a plaintiff in the absence of

---

[2] Mr. Schumacher contends that he "has alleged CPA's conduct violated both statues, and that is enough to confer upon him standing under Article III."  [Dkt. No. 43 at 5.]  This is not entirely accurate.  For example, if it were not Mr. Schumacher's cell phone that CPA called, Mr. Schumacher would have no standing to bring a claim even if CPA had indeed violated the TCPA by calling another, unrelated phone number.  Mr. Schumacher must have suffered some injury from CPA's alleged violation of the TCPA to satisfy Article III's standing requirements – which he has.

actual harm," as CPA accurately states [*see* Dkt. No. 37 at 6], the TCPA creates a privacy right which, when violated, satisfies the standing requirement of the injured party to pursue actual or statutory damages.  We agree with CPA that "'Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing'" [*see id.* at 7], and that an interest in statutory damages cannot be the sole injury to satisfy Article III requirements [*id.*], but that is not what has happened here.

Here, Mr. Schumacher's TCPA-created right to privacy was invaded by repeated automated calls from CPA.  "Congress referred to the interest protected by the TCPA as a 'privacy' interest, noting that '[e]vidence . . . indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." *Martin v. Leading Edge Recovery Solutions, LLC*, 2012 WL 3292838, at *2 (N.D. Ill. Aug. 10, 2012) (citing TCPA, 105 Stat. 2394, note following 47 U.S.C. § 227 (Congressional statement of findings)); *see also* Dkt. No. 43 at 6 (collecting cases from various circuits concluding that the Article III requirement of an injury-in-fact may be satisfied by the invasion of a legal right that Congress created even in the absence of monetary damages).  The court in *Anderson v. AFNI, Inc.* agreed:

> We are satisfied that [plaintiff] has constitutional standing in this case. She has demonstrated an injury in fact – the receipt of nearly fifty calls to her residential telephone number over eight months from an apparently implacable automated caller.  [Defendant] caused this injury by initiating these calls and the injury [plaintiff] suffered would be redressed by the award of damages.

No. CIV.A. 10-4064, 2011 WL 1808779, at *6 (E.D. Pa. May 11, 2011); *see also Martin*, 2012 WL 3292838, at *2 (finding standing where plaintiffs "were forced to tend to unwanted calls and that the calls used airtime from their cell phone plans.").[3]

We reach the same conclusion as the courts in *Martin*, *Anderson*, and *King*: We are satisfied that Mr. Schumacher has constitutional standing in this case. He has demonstrated an injury in fact[4] – the receipt of over fifty calls to his cellular telephone number over three months from an apparently implacable automated caller. CPA caused this injury by initiating these calls and the injury Mr. Schumacher has suffered would (and should) be redressed by the award of damages.

### 2.    TCPA Claims.

To establish a TCPA violation, Mr. Schumacher must show that he was called on his cellular telephone by an automatic telephone dialing system ("ATDS") without his

---

[3] We are not persuaded by CPA's argument that because "Plaintiff acknowledged as [sic] his deposition that he was unsure as to how many calls were even placed to him and guessed that it was between 20-30", he does not have standing to pursue his claim. [*See* Dkt. No. 37 at 6.] "Congress concluded that 'any' automated or prerecorded call would be an invasion of the called party's right to privacy, and its findings indicate that even a *de minimis* number of automated calls or voicemails would not be condoned." *Martin*, 2012 WL 3292838, at *4.

[4] CPA makes another frivolous argument, namely, that Mr. Schumacher has "admitted that he has incurred no injury in fact [and that he] seeks solely statutory damages." [Dkt. No. 37 at 6 (citing Plaintiff's Interrogatory Responses at ¶ 4); Dkt. No. 49 at 3 (citing Plaintiff's Deposition as "he suffered no actual damage to himself as a result of the calls from CPA").] CPA's summaries of Mr. Schumacher's statements are both imprecise and inaccurate. Mr. Schumacher stated in his interrogatory responses: "Plaintiff does not claim any actual damages and limits himself to any statutory recovery available pursuant to the [FDCPA] and the [TCPA]." [Dkt. No. 37-5 at 4-5.] In his deposition, Mr. Schumacher's *counsel* stipulated that Mr. Schumacher is only seeking statutory damages and not actual damages. [Dkt. No. 37-4 at 14.] Actual and statutory damages relate to the compensation for an injury, not whether an injury itself has occurred. CPA concedes this point when it stated: "proof of an *actual injury*, not actual damages, is plainly a constitutional requirement." [Dkt. No. 49 at 4 (emphasis in original).]

consent.  47 U.S.C. § 227(b)(1)(A).  An ATDS is defined by the TCPA as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator, and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  It is undisputed that Mr. Schumacher was called by CPA on his cellular telephone and it is undisputed that he did not give his consent to CPA or the creditor to be contacted.  The claim determinative issue here is whether Dial Connection is an ATDS subject to the TCPA.  Plainly, this question has been answered repeatedly by courts before us.

Mr. Schumacher argues that Dial Connection is a "predictive dialer".  [*See, e.g.*, Dkt. No. 33 at 8.]  "A predictive dialer is . . . hardware, when paired with certain software, [which] has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02–278, Report and Order, 18 FCC Rcd. 14014, 14091 (2003) ("2003 FCC TCPA Order").[5]  The 2003 FCC TCPA Order provides:

> As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.  *The principal feature of predictive dialing software is a timing function, not number storage or generation.*  Household Financial Services

---

[5] "In general, a district court gives great weight, if not controlling weight, to final decisions of the FCC implementing and interpreting the TCPA."  *Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014) (citing *CE Design, Ltd. v. Prism Business Media, Inc.,* 606 F.3d 443, 450 (7th Cir. 2010) (stating that "[i]n passing the Hobbs Act, Congress vested the power of agency review of final FCC orders exclusively in the courts of appeals" and that "[t]he Hobbs Act's jurisdictional bar thus does not leave private parties without a mechanism for judicial review of agency action; it merely requires litigants to seek review through its specific procedural path")).

states that these machines are not conceptually different from dialing machines without the predictive computer program attached.

. . . .   The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  The statutory definition contemplates autodialing equipment that either stores or produces numbers.  It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "*capacity* to store or produce telephone numbers (emphasis added) . . . ."

[Concerns of public safety and inappropriately shifting market costs from sellers to consumers] [c]oupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome.  *Therefore, to exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result.*  Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages.  We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented.  Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress.

*Id.* (emphasis added).[6]  The Federal Communications Commission ("FCC") states that "the basic function of such equipment . . . [is] the capacity to dial numbers without human intervention."  *In the Matter of Rules & Regulations Implementing the Tele. Consumer Prot. Act of 1991,* 23 F.C.C.R. 559, 566 (2008).

---

[6] CPA argues that the FCC Order is distinguishable because it relates to telemarketing. [Dkt. No. 37 at 16.]  This position is a non-starter as the FCC Order has been applied to debt collection matters and is not exclusively limited to telemarking regulation.

CPA claims that its Dial Connection software requires human intervention because the numbers to be called are submitted in a predetermined list and order. CPA further argues that its calls are not randomized nor do they exceed the list provided by CPA. [Dkt. No. 37 at 14-15.] Urging us to conclude that Dial Connection is not an ATDS, CPA argues that the telephone numbers are stored only for a day and each day a new list must be added on a daily basis. CPA's position based on these facts is contradicted by many courts, as well as the FCC. Specifically, the Southern District of Florida held:

> Many other courts, including this Court, have followed the FCC's interpretation that automated dialing systems that automatically dial cell phone numbers from a preprogrammed list, including the specific LiveVox software at issue in this action, are "automatic telephone dialing systems" under the TCPA. *See Bianchi v. Bronson & Migliaccio, LLP,* Case 0:09–cv–61164–UU, May 27, 2010, D.E. 59 at 5 ("The undisputed evidence in this case shows that LiveVox is a fully-automated dialing service, which calls debtors without any human intervention[.]"); *Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1043 (9th Cir.2012); *Swope v. Credit Mgmt., LP,* Case No. 12CV832, 2013 WL 607830, at *4 (E.D.Mo. Feb. 19, 2013) (The FCC has twice "held that predictive dialers are considered automatic telephone dialing systems subject to the TCPA, and that debt collectors are not exempt from the statute's prohibitions."); *Vance v. Bureau of Collection Recovery, LLC,* No. 10–cv–06324, 2011 WL 881550, at *2 (N.D.Ill. Mar. 11, 2011) ("[T]he FCC has indicated, and other courts have held, that predictive dialing systems do meet the definition of devices prohibited by the TCPA."); *see also Ortega v. Collectors Training Inst. of Ill.,* No. 09–21744–CIV, 2011 WL 241948, at *8 (S.D.Fla. Jan. 24, 2011) (denying summary judgment because there was evidence that defendants used an "auto dialer system" and because Plaintiff heard a "robot voice" on the message). *As such, it does not matter that the LiveVox software is not used to store or produce telephone numbers using a random or sequential number generator. It qualifies as an ATDS under the statute because it automatically dials telephone numbers from a preprogrammed list.*

*Lardner v. Diversified Consultants Inc.*, 17 F. Supp. 3d 1215, 1222-23 (S.D. Fla. 2014) (emphasis added); *see also Legg v. Voice Media Group, Inc.*, 20 F. Supp. 3d 1370, 1374-75 (S.D. Fla. 2014) (citing *Lardner*).

The court in *Moore v. Dish Network L.L.C.* reached the same conclusion in analyzing facts strikingly similar to those here. 57 F. Supp. 3d 639, 654 (N.D. W.Va. 2014). The court in *Moore* concluded that human involvement in creating a list of telephone numbers to be dialed does not exclude a predictive dialer from the statutory definition of ATDS. It reasoned:

> Here, it is apparent that DISH focuses on evidence of human involvement in the list-creation process to avoid the clear implication of the FCC's decision as applied to this case—that the Cisco Dialer is a predictive dialer. In its 2003 Order, the FCC defined a predictive dialer as having the "*capacity to store or produce numbers and dial those numbers* at random, in sequential order, or *from a database of numbers* " when paired with software. 2003 FCC Order, 18 F.C.C.R. at 14091 (emphasis added). The FCC did reference the lack of human involvement typical of a predictive dialer, but only to explain why it found a predictive dialer qualified as an ATDS. *See id.* at 14092. Thus, contrary to DISH's argument, *it is irrelevant under the FCC's definition of a predictive dialer that humans are involved in the process of creating the lists that are entered into the Campaign Manager software*. *See Sterk,* 46 F.Supp.3d at 819, 2014 WL 2443785, at *4 (finding system was a predictive dialer despite fact that users of the defendant's service made their contact information available to the defendant because users' involvement was "essentially the same as when a call list is entered by a telemarketer in a database").

*Id.*[7]

We reach the same conclusion here.  Dial Connection is a predictive dialer and therefore an ATDS.  Dial Connection has the capacity to store numbers and dial those numbers from a database.  It is irrelevant that humans are involved in the process of creating the list of numbers to be called.  As has been well-established in caselaw and FCC interpretation, Dial Connection is an ATDS under the TCPA because it automatically dials telephone numbers from a preprogrammed list.

As stated above, it is undisputed that Mr. Schumacher received calls to his phone from CPA without his consent.  Because Dial Connection is an ATDS under the TCPA, CPA violated the TCPA when it repeatedly called Mr. Schumacher.  The TCPA provides statutory damages in the amount of $500 per violation.  47 U.S.C. § 227(b)(3)(B).  The evidence demonstrates that CPA's own records establish that it called Mr. Schumacher 54 times between August 2, 2013 through November 6, 2013.  No dispute exists as to the number of times CPA called Mr. Schumacher.  The phone records clearly reflect 54 calls made to Mr. Schumacher by CPA.  These records are not inconsistent with Mr. Schumacher's deposition recollection a year after the calls were made.  Therefore, CPA is liable to Mr. Schumacher for $27,000 in statutory damages for violations of the TCPA.

---

[7] CPA urges us to disregard the FCC's Orders interpreting the TCPA because the FCC lacks the statutory authority to broaden the definition of an ATDS to include a "predictive dialer." [Dkt. No. 37 at 15-16.]  CPA's argument is "exactly the kind of attack on an FCC order that the Hobbs Act precludes me from entertaining. There is functionally no difference between saying the FCC got an interpretation wrong and saying it lacked the authority to give the interpretation in the first place. Both lines would have me 'determine the validity of' an FCC decision." *Johnson v. Yahoo!, Inc.*, No. 14 CV 2028, 2014 WL 7005102, at *3 (N.D. Ill. Dec. 11, 2014) (citing 28 U.S.C. § 2342(1)).

**B.     FDCPA.**

The FDCPA, on the other hand, is related to debt collection.  "The primary goal of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices, including threats of violence, use of obscene language, certain contacts with acquaintances of the consumer, late night phone calls, and simulated legal process." *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1324 (7th Cir. 1997).  "To establish a prima facie case under the FDCPA, plaintiff must prove that he is a natural person or 'consumer' who is harmed by violations of the FDCPA; that the debt arises from a transaction entered for personal, family or household purposes; that defendant is a debt collector; and that defendant has violated a provision of the FDCPA." *Pantoja v. Portfolio Recovery Associates, LLC*, 78 F. Supp. 3d 743, 745 (N.D. Ill. 2015) (citing *Freeland v. Kulak*, 2013 WL 6036841 *3 (N.D. Ind. Nov. 13, 2013)).

Mr. Schumacher has asserted claims against CPA under sections 1692d, 1692d(5), and 1692f of Title 15 of the United States Code:

> 30.     The Defendants' conduct violated 15 U.S.C. § 1692d in that Defendants engaged in behavior the natural consequence of which was to harass, oppress, or abuse the Plaintiff in  connection with the collection of a debt.
>
> 31.     The Defendants' conduct violated 15 U.S.C. § 1692d(5) in that Defendants caused  a phone to ring repeatedly and engaged the Plaintiff in telephone conversations, with the intent to annoy and harass.
>
> 32.     The Defendants' conduct violated 15 U.S.C. § 1692f in that Defendants used  unfair and unconscionable means to collect a debt.33.

[Compl. at ¶¶ 30-32.]

Section 1692d provides:  "A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt" and does not require evidence that the debt collector acted with the *intent* to harass, oppress, or abuse any person, but rather that its actions were the *natural consequence* of its conduct.  Subsection 5 of section 1692d provides that "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number" is a violation of the FDCPA.  In contrast to a claim under § 1692d, Subsection 5 requires a showing that the debt collector intend to annoy, abuse, or harass the person called.  Title 15 U.S.C. § 1692f provides that "[a] debt collector may not use  unfair or unconscionable means to collect or attempt to collect any debt."

It is undisputed that CPA made 54 calls to Mr. Schumacher over the course of three months.  These calls were made between the hours of 9:00 a.m. and 8:00 p.m.  On two occasions, CPA called Mr. Schumacher twice in one day.  The remaining calls were made only once per day.  CPA never spoke to Mr. Schumacher and therefore never asked Mr. Schumacher to pay any money to CPA.

### 1. 15 U.S.C. §§ 1692d and 1692d(5).

A claim under § 1692d considers whether a "natural consequence" of CPA's conduct was to "harass, oppress, or abuse" Mr. Schumacher.  In contrast, a claim under § 1692d(5), looks at whether CPA's calls were intended to annoy, abuse, or harass Mr. Schumacher.  Unlike a claim under § 1692d(5), CPA's intent is irrelevant to a claim pursuant to § 1692d.  *See Horkey v. J.V.D.B. & Assoc., Inc.*, 333 F.3d 769, 774 (7th Cir.

2003) ("[Plaintiff] points to no evidence in the record regarding [Defendant's] intent, which is just as well, because [Defendant's] intent is irrelevant" in a § 1692d claim.).   Because both claims relate to the number of calls, their frequency, and the circumstances under which they were made, we consider both claims together.

Mr. Schumacher contends that the 54 unsolicited calls made to his cell phone and CPA's failure to make a live person available with whom he could speak to object to the calls "suggests that the natural consequence of CPA's conduct was to harass, oppress or abuse Schumacher." [Dkt. No. 43 at 8.][8]  Mr. Schumacher argues that these issues must be decided by a jury. *See, e.g.*, *Meadows v. Franklin Collection Serv., Inc.*, 414 Fed. Appx. 230, 233 (11th Cir. 2011) ("Ordinarily, whether conduct harasses, oppresses, or abuses will be a question for the jury.").  In support of his position, Mr. Schumacher cites a compilation of cases wherein courts have denied summary judgment because whether a debt collector's calls were unreasonable or made with an intent to annoy, abuse, or harass is a question for the jury.  [Dkt. No. 43 at 9-10 (citing *Meadows,* 414 Fed. Appx. at 233 ("Ordinarily, whether conduct harasses, oppresses, or abuses will be a question for the jury."); *Hendricks v. CBE Group, Inc.,* 891 F.Supp.2d 892, 896 (N.D. Ill. 2012) (denying summary judgment on a § 1692d(5) claim, where the Court concluded that "reasonable juror[s] could find that

---

[8] CPA notes that neither § 1692d nor any other section of the FDCPA requires a debt collector to make a live person available with whom the person being called can speak.  CPA further contends that "[n]o case has interpreted the FDCPA in this manner." [Dkt. No. 49 at 7.] Although CPA argues that Mr. Schumacher could have inputted his number into a system that would automatically disassociate the account with the telephone number, its argument is not substantiated by any evidence (and is contradicted by Mr. Schumacher's two attempts to contact CPA via the number CPA claims would automatically disassociate the account with his number) and cannot be the basis for granting summary judgment.  [Dkt. No. 49 at 7.]

[the debt collector] placed calls to [plaintiff] with an intent to annoy, abuse or harass"); *Akalwadi v. Risk Management Alternatives, Inc.,* 336 F.Supp.2d 492 (D. Md. 2004) (reasonableness of 26 to 28 calls over two months, at times on a daily basis, with up to three calls within five hours in a single day, was a question of fact for the jury); *Joseph v. J.J. Mac Intyre Companies, LLC,* 281 F.Supp.2d 1156, 1164 – 65 (N.D. Cal. 2003) (declining to decide whether 75 phone calls constituted a pattern of harassment because the issue "cannot be decided as a matter of law."); *Joseph v. J.J. Mac Intyre Companies, LLC,* 238 F.Supp.2d 1158, 1169 (N.D. Cal. 2002) (finding it a "triable issue of fact" whether 200 calls over a 19-month period constituted harassment, when on some days, multiple calls were placed within hours of plaintiff's requests for no further calls.)); *see also Majeski v. I.C. Sys., Inc.*, No. 08 CV 5583, 2010 WL 145861, at *3-4 (N.D. Ill. Jan. 8, 2010) (analyzing FDCPA cases with differing outcomes and concluding that in that case Plaintiffs were not entitled to summary judgment because the court could not assume that no reasonable juror could find an intent to harass).]

Not to be outdone, CPA offers its own compilation of cases wherein courts have granted summary judgment in favor of defendant where no reasonable jury could determine that the number of calls and the circumstances under which those calls were made demonstrated that the natural consequence or intent of those calls was to harass, oppress, or abuse the recipient of the calls.  [Dkt. No. 37 at 7-10 (citing *Pugliese v. Prof'l Recovery Serv., Inc.,* 2010 WL 2632562, *10 (E.D. Mich. June 29, 2010) (350 calls in an eight month period even after the plaintiffs asked the collector to cease calling found insufficient as a matter of law to establish violation of FDCPA § 1692d(5)); *Tucker v. CBE Grp., Inc.,*710

20

F.Supp.2d 1301, 1303 (M.D. Fla. 2010) (57 calls and 6 messages to the plaintiff found not harassing even though defendant called 7 times a day where plaintiff never notified defendant it was calling the wrong number demonstrated an intent to reach the debtor, not an intent to harass); *Carman v. CBE Group, Inc.*, 782 F. Supp.2d 1223, 1232 (D. Kan. 2011) ("[T]he evidence [of 149 calls over two months] suggests an intent by CBE to establish contact with plaintiff, rather than an intent to harass.")); *Martin v. Select Portfolio Serving Holding Corp.,* 2008 WL 618788, *6 (S.D. Ohio March 3, 3008) ("Any call from a debt collector may be presumed to be unwelcome, but that alone is insufficient to constitute a violation of the FDCPA."); *Beeders v. Gulf Coast Collection Bureau,* 796 F.Supp.2d 1335, 1338 (M.D. Fla.2011) (finding no FDCPA violation where the calls occurred for five months, they were received between 8:00 A.M. to 11:00 A.M., and occurred at a frequency of no more than one call per day); *Valle v. Nat'l Recovery Agency,* No. 10–2775, 2012 WL 1831156, at *2 (M.D. Fla. May 18, 2012) (listing six separate cases where summary judgment was granted finding no FDCPA violation where the plaintiff's evidence was solely high call volume); *Lardner*, 17 F.Supp.3d at 1226 (granting summary judgments where debt collector made 142 automated calls over an eight month period between the hours of 8:00 a.m. and 8:00 p.m. and debtor did not request the communications stop)); Dkt. No. 49 at 9 (citing *Lynch v. Nelson Watson & Assocs., LLC,* No. 10–CV–2025, 2011 WL 2472588, at *2 (D. Kan. June 21, 2011) (fifty-six calls over approximately three months, without more, was not an FDCPA violation); *Clingaman v. Certegy Payment Recovery Svcs.,* No. 10–2483, 2011 WL 2078629, at *4 (S.D.Tex. May 26, 2011) (fifty-five calls between March 4 and June 18 was not a violation where plaintiff

21

never asked defendant to stop calling); *Jones v. Rash Curtis & Assocs.*, No. 10–CV–0225, 2011 WL 2050195, at *2–3 (N.D.Cal. Jan. 3, 2011) (179 calls was not a violation where, among other things, plaintiff did not ask defendant to stop calling)).]

As evident from the scores of cases cited by the parties, "there are no bright-line rules as to what constitutes harassment or what demonstrates intent to annoy." *Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 228 (D. Mass. 2014).  Instead, courts consider a multitude of factors including "the volume, frequency, and persistence of calls, to whether defendant continued to call after plaintiff requested it cease, and to whether plaintiff actually owed the alleged debt." *Id.*

Here, we agree that the high volume of calls placed by CPA to Mr. Schumacher could be indicative of CPA's attempt to contact the debtor and not an intent to annoy, harass, or abuse.  However, we hesitate to assume that no reasonable juror could find otherwise, particularly given the unique circumstance here that Mr. Schumacher attempted to contact CPA and request that it stop contacting him (albeit his efforts were limited to two calls within one minute of each other).  In granting summary judgment for the defendant in *Tucker*, the court emphasized that  "defendant was not notified that it could not reach [the debtor at plaintiff's phone number] and plaintiff did not request that [defendant] cease calling." *Tucker*, 710 F. Supp. 2d at 1305.  Here, although it is undisputed that Mr. Schumacher did not communicate a request that CPA cease calling

him, he attempted to do so.[9]  The weight to be given to Mr. Schumacher's efforts to communicate with CPA is a determination for the jury that cannot be resolved on summary judgment.

We do not conclude that the volume of calls coupled with Mr. Schumacher's inability to communicate with CPA demonstrate that, as a matter of law, no reasonable juror could find that CPA did not intend or that its conduct did not have the natural consequence of harassing, annoying, or abusing Mr. Schumacher.  As a result, we deny CPA's request for summary judgment on Mr. Schumacher's §§ 1692d and 1692d(5) claims.

### 2.      15 U.S.C. § 1692f.

Title 15 U.S.C. § 1692f, for its part, states that "[a] debt collector may not use  unfair or unconscionable means to collect or attempt to collect any debt."  Section 1692f identifies eight specific acts that constitute a violation of § 1692f, such as collecting any amount unless it is authorized by the agreement creating debt or accepting postdated payments or threatening nonjudicial action or communicated by post card.  *See generally* § 1692f.  The Complaint contains no specific allegations to support a claim for violation of § 1692f.  Mr.

---

[9] CPA argues that the "sole fact that Plaintiff received erroneous calls is insufficient to state a claim under [] § 1692d(5) . . . of the FDCPA."  [Dkt. No. 37 at 9; *see also id.* at 10 (citing *Crain v. Pinnacle Fin. Group of MN, Inc.*, No. 07-cf-12075, 2007 WL 3408540, at *5 (E.D. Mich. Mov. 14, 2007) ("Repetitive calling can be inferred, but nothing in Plaintiff's assertion or anywhere else in the record suggests Defendant intended to annoy, abuse or harass Plaintiff. Bare allegations in the complaint are not sufficient to fill the void. The court will thus grant Defendant summary judgment for Plaintiff's claim under Section 1692d(5).").]   The fact that Mr. Schumacher *attempted* to contact CPA and stop the calls, including blocking its number from reaching his phone, is an additional factor to be considered in determining intent under § 1692d(5) that will be left for the jury.

Schumacher's Interrogatory responses confirm that he never spoke to CPA or communicated with CPA [Interrog. at ¶ 19] and did not pay any amount on the debt that CPA contacted Mr. Schumacher about [*id.* ¶ 7] and that he never received anything in writing from CPA [*id.* ¶ 5]. CPA argues that "[t]he sole fact that Plaintiff received erroneous calls is insufficient to state a claim under . . . 1692f of the FDCPA". [*See* Dkt. No. 37 at 9.] We agree.

The court in *Turner v. Professional Recovery Services, Inc.* considered a § 1692f claim which was based on allegations related to plaintiff's §§ 1692d and 1692d(5) claims. That court held:

> Plaintiff [] argues PRS's intent in making repeated phone calls to her despite its knowledge that she could not pay was unfair and unconscionable. Plaintiff's Memo at 10. PRS's intent in making repeated phone calls to plaintiff is specifically addressed by § 1692d and § 1692d(5). Therefore, these alleged wrongful acts also cannot be the basis of a separate claim under § 1692f. *See Adams,* 926 F.Supp. at 528; *see also Foti,* 424 F.Supp.2d at 667. Because plaintiff does not point to any alleged unfair or unconscionable conduct not addressed by § 1692c(a)(1) or § 1692d, her claims pursuant to § 1692f are redundant. Consequently, summary judgment is granted as to Count Four.

956 F. Supp. 2d 573, 580-81 (D.N.J. 2013). Mr. Schumacher has not identified any "unfair or unconscionable means to collect or attempt to collect any debt" and his allegations that CPA repeatedly made phone calls to him is addressed in his §§ 1692d and 1692d(5) claims. As a result, his § 1692f claim fails as a matter of law.

Furthermore, Mr. Schumacher did not oppose CPA's motion for summary judgment on his § 1692f claim. [*See generally* Dkt. No. 43 at 7-10.] "'It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons,

legal or factual, why summary judgment should not be entered.'" *Booker v. LPN Goodrich*, No. 1:03-CV-366-DFH-TAB, 2005 WL 2129057, at *4 (S.D. Ind. Aug. 30, 2005) (citing *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th Cir. 1999)).  Mr. Schumacher is deemed to have abandoned his § 1692f claim.  *See Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 n.2 (7th Cir. 1996).  The well-supported facts relied on by the CPA in support of its motion for summary judgment are accepted as true for the purpose of the court's resolution of the motion.  *Corder v. Lucent Techs., Inc.,* 162 F.3d 924, 927 (7th Cir. 1998).  Consequently, Mr. Schumacher's § 1692f claim fails as a matter of law and CPA is entitled to summary judgment in its favor.

### 3.    CPA's Arguments that Mr. Schumacher's FDCPA Claims Were Made in Bad Faith and for Purposes of Harassment.

CPA argues that Mr. Schumacher's claims under the FDCPA were made in bad faith, for the purposes of harassment, and in an attempt to compound the litigation by adding the possibility of the prevailing party to recover attorneys' fees.[10]  CPA's argument is based in large part on Mr. Schumacher's allegations in his Complaint that have turned out to be false.  Specifically, on October 21, 2013, Mr. Schumacher alleged:

> 18. If CPA at one time obtained prior express consent to place calls to Plaintiff's cellular telephone number, it no longer had consent to call Plaintiff after being informed by Plaintiff that the Debtor could not be reached at his number and after being repeatedly instructed by Plaintiff to cease all calls to him.

---

[10] Arguing that Mr. Schumacher's FDCPA claims are groundless, CPA emphasizes "[t]he fact that the FDCPA is not even mentioned in Plaintiff's summary judgment papers gives the game away." [Dkt. No. 37 at 12.]  As Mr. Schumacher notes, a party's decision *not* to move for summary judgment on one of its claims or defenses is not evidence that such a claim is frivolous or baseless or that attorneys' fees should be award to the opposing party.

19. During each live conversation with Plaintiff, CPA informed Plaintiff that the call was an attempt to collect the Debt and requested to speak to the Debtor.

20. Each time, Plaintiff informed CPA that it was calling his personal cellular telephone and that the Debtor was unknown to him and unreachable at his telephone number.

21. Each time, Plaintiff instructed CPA to remove his telephone number from the account and cease all communications with him.

22. However, despite having been informed of such and directed to cease communications, CPA continued calling Plaintiff in an attempt to collect the Debt.

[Compl. at ¶¶ 18-21.]

None of these allegations are true, given Mr. Schumacher's post-Complaint admissions.  Five months after filing his Complaint, on March 27, 2014, Mr. Schumacher admitted in his interrogatory responses that he never spoke to CPA.  [*See* Dkt. No. 37-5 at No. 5 ("There was no live person on the line with whom Plaintiff could communicate. Plaintiff called CPA back several times in an effort to advise that CPA was calling the wrong number but when he did, he would receive a quick hang up and the system never connected him to a live person.").]   Seven months later, on October 30, 2014, Mr. Schumacher testified in his deposition:

**Q.** Okay. Did you ever speak to anyone at Credit Protection Association?

**A.** I would say "no," not that I know of.

**Q.** Did you ever have a live communication with anyone at Credit Protection Association?

**A.** No.

26

[Dkt. No. 39-4 at 13-14.]  Mr. Schumacher did not amend his Complaint after admitting that he did not speak to anyone at CPA.  As a result, CPA contends that Mr. Schumacher's FDCPA claims "were brought solely to harass and compound this litigation, interjecting the threat of fee shifting liability onto CPA."  [Dkt. No. 37 at 12.]

As a remedy for what it perceives as bad faith, CPA seeks its attorneys' fees incurred in responding to Mr. Schumacher's FDCPA claims.  Its request is based on authority from two statutory provisions.  First, CPA points to § 1692k(a)(3) of the FDCPA, which states: ". . . On a finding by the court that any action under the section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs."  15 U.S.C. § 1692k(a)(3).  Second, CPA directs us to 28 U.S.C. § 1927, which provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Section 1927 does not apply only when a party loses on the merits, but rather any time an attorney (or others) abuse the court processes.  *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762 (1980).  Section 1927 creates a continuing obligation for attorneys to dismiss claims that are no longer viable.  *Jolly Group, Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006); 28 U.S.C. § 1927 ("Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.").

27

CPA posits that Mr. Schumacher had "no factual basis to pursue his FDCPA claims from the outset" [Dkt. No. 37 at 13], but even so, that Mr. Schumacher should have abandoned his claims after responding to discovery in direct contravention to his pleadings. Although it is deeply troubling that Mr. Schumacher and his counsel would fail to amend his Complaint due to an obvious error arising at the beginning of the litigation, we cannot say at this time that *no* factual basis exists for Mr. Schumacher's claim, even though certain Complaint allegations related to Mr. Schumacher's alleged communications with CPA turned out to be false.[11]   Indeed, we determined that whether the volume of calls and Mr. Schumacher's inability to communicate with CPA constitutes a violation of the FDCPA is another question for the jury to resolve.

Mr. Schumacher responds to CPA's serious allegations with limited legal authority and an extremely thin, unsupported factual analysis.   Indeed, Mr. Schumacher's case-specific retort to CPA's allegations of bad faith consists of the following four sentences:

> Here, there are no facts to suggest that Schumacher's FDCPA claim has been brought in bad faith and for the purpose of harassment.  Rather, all facts point to the viability and legitimacy of such claim.
>
> . . .
>
> There is nothing before the court to suggest that the undersigned counsel's actions reach this level.  Furthermore, there is no evidence to suggest that the

---

[11] Although CPA argues that "Plaintiff's entire deposition was focused on the issues related to the FDCPA," [Dkt. No. 37 at 13] we note that Mr. Schumacher's deposition took exactly 31 minutes and the transcript consisted of a mere 27 pages, casting CPA's description of the "entire deposition" in a significantly different light.  CPA did, however, move for summary judgment on Plaintiff's FDCP claim which is significantly different after discovery from the inaccurately-plead facts contained in Mr. Schumacher's Complaint.

> instant action was brought in bad faith and for the purpose of harassment
> such that CPA's request for sanctions should be denied.

[Dkt. No. 43 at 11, 12.]  Mr. Schumacher's statement that no facts suggest his FDCPA claim was brought in bad faith is a bold one considering that Mr. Schumacher's FDCPA allegations in his Complaint are patently false.  Mr. Schumacher does not attempt to explain away these inconsistencies.  Mr. Schumacher does not even attempt to refute CPA's claim that he "assert[ed] allegations that were known to be false in attempts to bolster the claim."  [*See* Dkt. No. 37 at 12.]  Mr. Schumacher offered no explanation for his failure to amend his Complaint in March, 2014, when he served interrogatory responses that contradicted his complaint allegations, or in October, 2014, when he offered deposition testimony that contradicted the allegations in his complaint.

It is without doubt that Mr. Schumacher and his counsel improperly handled their pleadings.  It is also clear that, after Mr. Schumacher admitted facts inconsistent with those in the Complaint, Mr. Schumacher's counsel had (and continues to have) obligations under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927 to amend the Complaint and inform the Court of the veracity of the information before it.  Plaintiff's counsel did not see to these responsibilities.  Although we withhold a decision at this time finding that Mr. Schumacher's FDCPA claims are entirely meritless and based upon inaccurate Complaint allegations, we have identified troublesome indicia of foul play by Mr. Schumacher and/or his counsel, who are expressly admonished here henceforth to comply with all the applicable rules of practice before this Court.  CPA's request for sanctions is DENIED for now, without prejudice to future reconsideration as may prove necessary and appropriate.

## Conclusion

For the foregoing reasons, we:

· GRANT Plaintiff's Motion for Summary Judgment related to his TCPA claim (Count II) and consequently DENY Defendant's Motion for Summary Judgment as to the same claim;

· DENY Defendant's Motion for Summary Judgment related to Plaintiff's FDCPA claim (Count I) with respect to ¶¶ 30 and 31 (alleging violations of 15 U.S.C. §§ 1692d and 1692d(5), respectively) because questions of material fact exist which preclude the entry of summary judgment;

· GRANT Defendant's Motion for Summary Judgment related to Plaintiff's FDCPA claim (Count I) with respect to ¶ 32 (alleging violations of 15 U.S.C. § 1692f); and

· DENY WITHOUT PREJUDICE Defendant's request for sanctions.


Date:   9/30/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Avanti Deepak Bakane
HINSHAW & CULBERTSON, LLP
abakane@hinshawlaw.com

Justin M. Penn
HINSHAW & CULBERTSON, LLP
jpenn@hinshawlaw.com

Amy L. Cueller
THE CUELLER LAW OFFICE
amy@cuellerlaw.com